# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHARLENE SMITH-THOMPSON      :
                                        :

         Plaintiff                  :

         vs.                       :   **Case No. 06-01945 (HHK)**

                                          :

PABLO RODRIGUEZ, et al.          :

                                          :

         Defendants        :

## MOTION TO REMAND AND TO MOOT MOTION TO DISMISS

COMES NOW, the Plaintiff, Charlene Smith-Thompson, by and through her attorneys, Jay P. Holland, Brian J. Markovitz and the law firm of Joseph, Greenwald & Laake, P.A., and pursuant to 28 U.S.C. §1447 moves to remand this matter to the District of Columbia Superior Court, thus rendering Defendant's pending motion to dismiss moot, and in support thereof, states as follows:

### FACTS

1. On or about August 11, 2006, Plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC") asserting her rights under 42 U.S.C. §§ 2000(e) *et. seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"). *See* Charge of Discrimination, dated August 11, 2006 attached as Exhibit 1. To date, Plaintiff has not received a right to sue letter from the EEOC. As such, the EEOC still maintains jurisdiction over her complaint with the agency, and therefore, it also maintains jurisdiction over her Title VII claims.

2. On or about August 17, 2006, subsequent to filing her EEOC complaint, Plaintiff filed a complaint in the Superior Court of the District of Columbia asserting her rights under the District of Columbia Human Rights Act D.C. Code Ann. §2-1401.01, *et. seq.* but also listing a claim under Title VII. *See* District of Columbia Superior Court Complaint,

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

attached to Notice of Removal at Exhibit A

3. On November 14, 2006, Defendant District of Columbia filed a notice of removal

pursuant to 28 U.S.C. §§1441(b) & 1446 asserting that a federal, statutory question had

been posed under Title VII of the Civil Rights Act of 1964. *See* Notice of Removal at

¶¶2-3.

4. On November 22, 2006, Defendant District of Columbia filed a motion to dismiss this

matter.

5. On November 29, 2006, Plaintiff filed an Amended Complaint in the Superior Court to

correct for the premature listing of claims under Title VII of the Civil Rights Act of 1964,

prior to a right to sue letter from the EEOC being issued. *See* Motion for Leave to

Amend and First Amended Complaint, attached as Exhibit 2. As such, Plaintiff is no

longer asserting a federal claim in this action.

## Standard of Review

6. "[R]emoval statutes are to be strictly construed." *See Williams v. Howard University*,

984 F.Supp. 27, 29 (D.D.C. 1997) (citing *Shamrock Oil & Gas Corp. v. Sheets,* 313 U.S.

100, 107-09 (1941); *Diaz v. Sheppard,* 85 F.3d 1502, 1505 (11th Cir.1996)). Any doubt

about whether removal was proper should be resolved in favor of remanding the case to

state court. *See Holmes v. PHI Service Co.*, 437 F.Supp.2d 110, 114 (D.D.C. 2006)

("Where the need to remand is not self-evident, the court must resolve any ambiguities

concerning the propriety of removal in favor of remand") (quoting *Johnson-Brown v.*

*2200 M St.*, L.L.C., 257 F.Supp.2d 175, 177 (D.D.C.2003)). The burden always remains

with the Defendant to prove that jurisdiction is proper. *See Holmes*, 437 F.Supp.2d at

114 ("the defendant bears the burden of establishing that the federal court does have

jurisdiction") (citing *Phillips v. Corr. Corp. of Am.,* 407 F.Supp.2d 18, 20 (D.D.C.2005);

*Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377 (1994)).

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

**Argument**

7. Plaintiff initial complaint asserted Title VII claims, which Defendant, the District of Columbia used as the jurisdictional basis for removal to this Court. Because the EEOC still has jurisdiction over those claims, the Plaintiff has amended her complaint in the District of Columbia Superior Court, excluding Title VII claims. *See Bowden v. U.S.*, 106 F.3d 433, 437 (D.C. Cir. 1997) ("Complainants must timely exhaust these administrative remedies before bringing their claims to court") (citing *Brown v. GSA,* 425 U.S. 820, 832-33, 96 S.Ct. 1961, 1967-68, 48 L.Ed.2d 402 (1976); *Bayer v. United States Dept. of the Treasury,* 956 F.2d 330, 332 (D.C.Cir.1992)); *Wiley v. Johnson*, 436 F.Supp.2d 91, 94-95 (D.D.C.,2006) (same) (citing *Bowden v. U.S.,* 106 F.3d 433, 437 (D.C.Cir.1997); *Gillet v. King,* 931 F.Supp. 9, 12-13 (D.D.C.1996), *aff'd,* 132 F.3d 1481, 1997 WL 702536 (D.C.Cir.1997) (Table)).

8. Under 28 U.S.C. §1447 (c), this Court must remand this matter to the District of Columbia Superior Court because it lacks jurisdiction, as there is not and could not be a federal claim pending under Title VII because the EEOC still maintains jurisdiction over Plaintiff's Title VII claims. *See id.* ("If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded").

9. Therefore, because this Court lacks jurisdiction over any federal claims, Defendant cannot meet its burden of proving that removal was proper, and this "case shall be remanded" to the District of Columbia Superior Court. *Id.*; *see e.g. Holmes v. PHI Service Co.*, 437 F.Supp.2d at 114; *Johnson-Brown*, 257 F.Supp.2d at 177; *Phillips,* 407 F.Supp.2d at 20; *Kokkonen,* 511 U.S. at 377.

10. Additionally, because this matter is to be remanded to the District of Columbia Superior Court, Defendant's Motion to Dismiss is rendered moot.

WHEREFORE, the Plaintiff moves this Court to remand this matter to the District of

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

Columbia Superior Court, find that Defendant's Motion to Dismiss is moot, and for such other and further relief as the Court deems appropriate.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By:_____

Jay P. Holland  (Bar No. 422258)
Jholland@jgllaw.com
Brian J. Markovitz (Bar No. 481517)
Bmarkovitz@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)
Attorney for Plaintiff

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was e-filed on December 1, 2006 to:

Kimberly M. Johnson
Melvin W. Bolden, Jr.
Assistant Attorney General
441 Fourth St., N.W.
Sixth Floor South
Washington, D.C. 20001

Jay P. Holland, Esq.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CHARLENE SMITH-THOMPSON      :
                        :

      Plaintiff             :
                        :

      vs.               :    **Case No. 06-01945 (HHK)**
                        :

PABLO RODRIGUEZ, et al.      :
                        :

      Defendants         :

## O R D E R

UPON CONSIDERATION of the Motion to Remand and to Moot Motion to Dismiss filed by the Plaintiff herein, it is this _____ day of _____, 2006, by the United States District Court for the District of Columbia,

**ORDERED**, that the Plaintiff's Motion to Remand and to Moot Motion to Dismiss be and hereby is **GRANTED;** and it is further,

**ORDERED** that this matter is remanded to the District of Columbia Superior Court for further proceedings; and it is further

**ORDERED** that Motion to Dismiss by Defendant, the District of Columbia is moot.

_____
JUDGE, U.S. District Court
for the District of Columbia

**Joseph
  Greenwald
    & Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

Copies to:

Jay Holland, Esq.
Brian J. Markovitz, Esq.
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770

Kimberly M. Johnson
Melvin W. Bolden, Jr.
Assistant Attorney General
441 Fourth St., N.W.
Sixth Floor South
Washington, D.C. 20001

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

# Joseph
# Greenwald
# & Laake

FRED R. JOSEPH (1943-1997)
ANDREW E. GREENWALD
WALTER E. LAAKE, JR.
STEPHEN A. FRIEDMAN
BURT M. KAHN
MICHAEL D. JACKLEY
STEVEN M. PAVSNER
BARBARA A. JORGENSON
TIMOTHY F. MALONEY
DAVID BULITT

DOV APFEL
JAY P. HOLLAND
TIMOTHY P. O'BRIEN
JERRY D MILLER
STEVEN B. VINICK
PAUL F. RIEKHOF
CARY J. HANSEL
DAVID S. COAXUM
BARBARA E. PALMER
LAWRENCE R. HOLZMAN

LISA M. VOSO
CLAIRE E. BUCHNER
BRIAN J. MARKOVITZ
VERONICA BYAM NANNIS
ABIGAIL ROSS HOPPER
REED SPELLMAN
KEVIN S. DALE
AMY L. PELLICIOTTA
JASON L. LEVINE
PAUL R. SCIUBBA

**Attorneys at Law**
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane · Suite 400
Greenbelt, Maryland 20770
(301) 220-2200 · Fax 220-1214
www.jgllaw.com

**PLEASE RESPOND TO
GREENBELT OFFICE**

Brian J. Markovitz
Direct Dial: 240-553-1207
E-Mail: bmarkovitz@jgllaw.com

August 11, 2006

**VIA FEDERAL EXPRESS**
**Air Bill # 8567 7263 7408**
U.S. Equal Employment Opportunity Commission
1801 L Street N. W., Suite 100
Washington DC, 20507

Re: Charline Smith Thomas v. DC Dept of Correction; EEOC Complaint

Dear Sir or Madam:

We represent Ms. Smith-Thomas in the above-referenced matter. Enclosed please find an original and one copy of the above-referenced EEOC Complaint. Please file the original of the Complaint, date stamp the extra copy and return the copy in the enclosed self-addressed and stamped envelope. Please contact me if you need anything further.

Very truly yours,

Joseph, Greenwald & Laake, P.A.

Brian J. Markovitz

BJM/mcj
Enclosures

135 W. Dares Beach Road, Suite 209A
Prince Frederick, Maryland 20678
(410) 535-3572

**EXHIBIT**

**1**

1 Church Street, Suite 601
Rockville, Maryland 20850
(301) 220-2200

| CHARGE OF DISCRIMINATION | AGENCY | CHARGE NUMBER |
|---|---|---|
| This form is affected by the Privacy Act of 1974; See Privacy act statement before completing this form.<br><br>**District of Columbia Commission on Human Rights** and EEOC<br>*State or local Agency, if any* | [ X ] FEPA<br><br>[x] EEOC | |

| NAME *(Indicate Mr., Ms., Mrs.)* | | HOME TELEPHONE *(Include Area Code)* |
|---|---|---|
| Charlene Smith-Thompson | | **301-877-6182** |
| STREET ADDRESS<br>**8107 Foxhall Road** | CITY, STATE AND ZIP CODE<br>**Clinton, MD 20735** | DATE OF BIRTH<br>**12/24/60** |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one list below).

| NAME<br>**DC Department of Corrections** | NUMBER OF EMPLOYEES, MEMBERS<br>**900+** | TELEPHONE *(Include Area Code)*<br>**202-671-2135** |
|---|---|---|
| STREET ADDRESS<br>**1923 Vermont Ave, N.W.** | CITY, STATE AND ZIP CODE<br>**Washington, DC 20001** | COUNTY |
| NAME | NUMBER OF EMPLOYEES, MEMBERS: | TELEPHONE *(Include Area Code)* |
| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |

| CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box (es)* | DATE DISCRIMINATION TOOK PLACE<br>EARLIEST (ADEA/EPA)      LATEST (ALL) |
|---|---|
| [ ] RACE    [ ] COLOR    [X] SEX    [ ] RELIGION    [ ] NATIONAL ORIGIN<br><br>[X] RETALIATION    [ ] AGE    [ ] DISABILITY    [ ] OTHER Pregnancy Act | **September 2004**<br><br>[X] CONTINUING ACTION |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)*

For sexual harassment allegations prior to May 20, 2006 please see attached Report of Investigation from the Office of Special Investigation / DC Department of Corrections.

May 2006 to present:
Despite an internal investigation and report stating a cause of action for sexual harassment (see attached), Mr. Pablo Rodriguez continues to work in his original position with the DC Department of Corrections (DOC). Ms. Charlene Smith-Thompson continues to be employed with the DOC as well. Ms. Smith-Thompson has visited a hospital complaining of headaches, and chest pain. There she was diagnosed with non-cardiac chest pain and was referred to two doctors for psychotherapy, one of whom has initiated treatment with two prescription drugs. Ms. Smith-Thompson has been evaluated by a psychiatrist (on July 13, 2006), who subsequently diagnosed her as suffering from Major Depressive Disorder manifest by a blunting affect, a depressed mood, anhedonia, hypersomnia, anorexia, and weight loss. The psychiatrist has recommended the following: (1) that she be separated from working with Mr. Pablo Rodriguez because her symptoms are related to Mr. Rodriguez's harassing conduct in the workplace; (2) that after 3-4 weeks of treatment she will be able to return to modified, accommodated, light duty (3) that if Ms. Smith-Thompson is returned to the DC Jail and continues to be harassed, she will experience an exacerbation of her symptoms.

Despite these recommendations the DOC continues to retaliate against Ms. Smith-Thompson by insisting that she continue to work at the DC Jail with Mr. Rodriguez. Additionally, when she works at the DC Jail many of her co-workers tell her that she did the wrong thing by filing a complaint against Mr. Rodriguez. She continues to feel as though everyone is staring at her with distrust and condescension. The DOC has

refused to put her on light duty and refused to separate her and the harasser. On May 21, 2006, Ms. Smith-Thompson was forced to stop working as a result of her experiencing headaches, chest pain, and depression. However, despite the doctor's explanation and recommendations, the DOC placed Ms. Smith-Thompson on a status of "absent without leave" (AWOL), a clear retaliation. Ms. Smith-Thompson is now absent from work without pay and fears returning to work if she has to work in the same environment with the man who sexually assaulted her and her peers and managers who blame her even though she was the victim.

[x] I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone Number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY – (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT          DATE

Sworn to and subscribed to before the undersigned notary public in and for said jurisdiction this ___ day of _AUGUST_, 200 6

My commission expires: ___

Notary Public

OFFICE OF THE SPECIAL INSPECTOR DISTRICT OF COLUMBIA
DEPARTMENT OF CORRECTIONS
Smith-Thompson v. Pablo Rodriguez Case No. OSI-05-0006CST
REPORT OF INVESTIGATION
Investigator:   Inga A. Watkins 901 N. Pitt Street Suite 320 Alexandria, Virginia (703) 549-7211

CASE: Charlene Smith-Thompson v. Pablo Rodriguez Case No. OSI-05-0006CST
INVESTIGATIOR:   Inga Watkins
DATE SUBMITTED: March 20, 2006
SCOPE OF INVESTIGATION: Whether or not the allegations of the complaint constitute sexual harassment in violation of law or policy of Department of Corrections

## I.    CASE SUMMARY
### Case Narrative- Summary of Allegations and Response

Corporal Charlene Smith-Thompson (hereinafter "Complainant") filed a complaint of sexual harassment against Corporal Pablo Rodriguez (hereinafter "Respondent") on June 19, 2005 alleging that he repeatedly made sexually inappropriate gestures and comments to Corporal Charlene Smith-Thompson and Corporal Barry Bernard Linsey in Corporal Charlene Smith¬Thompson's presence. Complainant alleges that she asked Respondent to stop making the remarks on more than one occasion, but that after promising to stop the conduct, he would continue making inappropriate remarks. Complainant alleges that the conduct had been going on for approximately two months before she filed her complaint. Complainant stated that she had experienced difficulties with Corporal Rodriguez and filed a complaint against him in the past, but that she had dismissed her Complaint because he had apologized at that time after the parties participated in mediation. Corporal Pablo Rodriguez denies that he has engaged in any form of sexual harassment toward Corporal Smith Thompson. Corporal Pablo Rodriguez contends that Corporal Smith Thompson filed the complaint against him in retaliation for his complaint against her alleging that she was taking excessive breaks from her duty post and that she altered official logs. Respondent states that it was he who first filed a sexual harassment complaint against the Complainant during the fall of 2004 and that Complainant then filed a sexual harassment complaint against him at that time. Respondent agrees that the previous complaints were voluntarily dismissed by both parties after mediation, but denies that he apologized to the Complainant because he denies that he engaged in any conduct toward her warranting an apology. The testimony of the parties is summarized in more depth below. All references to page numbers refer to the page number of the transcript of the witness' recorded interview by the investigator.

## II. Issue for Investigation

**Sexual Harassment:** Whether or not the conduct alleged in the complaint constitutes sexual harassment in violation of the law or policy of the Department of Corrections as set forth in the Program Statement of the Department of Corrections issued on June 21, 2004.

### III.The Parties

Complainant Charlene Smith-Thompson has been stationed at the D.C. Jail with the Department of Corrections since 1989. Complainant was disabled from duty on June 27, 2001 and then was vacated from the Department in 2002 due to a reduction in force (RIF) before she ever returned back to duty. However, she returned to full time duty in September, 2004 and was stationed at the D.C. Jail when she returned to duty. She began working directly with the Respondent, Pablo Rodriguez at this time. Corporal Smith-Thompson was supervised by Sergeant Luis Stephens as the officer in charge during the time of the alleged events leading to the complaint. Sergeant Luis Stephens was a corporal at that time but received a promotion to Sergeant during the time of investigation of the complaint.

Respondent Pablo Rodriguez has been with the Department of Corrections since 1990. Prior to being stationed at the D.C. Jail, in the Northwest Two Unit, Corporal Rodriguez was stationed at Lorton Reformatory. Corporal Rodriguez was also supervised by Sergeant Luis Stephens as the officer in charge during the time of the alleged events leading to the filing of the complaint. Sergeant Stephens was a Corporal at that time but received a promotion to Sergeant during the time of the investigation of the complaint.

### IV. Witnesses

**Witnesses:**    Corporal Luis Stephens (officer-in charge), Corporal Barry Bernard Lindsay, Corporal Alvin Washington and Corporal Carolyn Tucker worked in the same cellblock or during the same shift as the parties at some point during the time of the alleged events. Lieutenant Gloria Profit was a supervising officer over the parties during the relevant time period.

### V. Summary of Interviews
### Complainant Charlene Smith Thompson

Complainant indicated that she started working with Respondent in September, 2004 in cellblock Northwest 2 but that she did not know him before that time. Complainant contended that only Officers Stephens and Lindsay worked in the cell block during the same shift along side Rodriguez and herself. Complainant stated that the first sexual transgression committed by Respondent occurred soon after she began working with him. She stated that Respondent grabbed here head as she was sitting in a chair near him and tried to push her head onto his "private parts". Complaisant testified that this incident as well as others involving alleged sexually charged remarks were the subject matter of the sexual harassment complaint previously filed by the Complainant against the Respondent. In another incident, Complainant testified that Respondent called her asking her about oral sex while broadcasting the call over the intercom. Complainant testified that when she complained to Sergeant Stephens, he told her that he had admonished the Respondent to stop speaking in a sexually explicit way when he was around her (p.18).

The allegations of conduct in 2005 were resolved in mediation and voluntarily dismissed by both parties (Tab 9). Complainant indicated that she thought that the matters were just being put on the "back burner" for the time being to give Respondent a chance to conduct himself appropriately.

Complainant contends that she was asked by Corporal Stephens and Special Inspector Carolyn Lerner to give the Respondent another chance since he was remorseful for his conduct and a newlywed such as herself. (p.12-15). As previously mentioned, Department records show that both Complainant and Respondent filed cross sexual harassment complaints against each other in the last quarter of 2005 and mutually agreed to dismiss the charges against the other after mediation.

Complainant testified that after a very short period of time after resolution of the previous complaint and the cease and desist order was lifted; Respondent started engaging in the conduct again. Complainant indicated that she would frequently share food that she was eating at work with the Respondent and wondered if he misconstrued what she considered to be her kindness.

Complainant testified that the first incident this year involved the Respondent touching her breast in a playful way. Complainant further testified that she responded to Respondent's playful touch by pushing and hitting him in his arm with her fist (p. 22). According to the Complainant, the Respondent responded by telling her not to hit him and then leaving the room and reading a newspaper out on the floor of the cell block ( p. 22-23).

Complainant stated that Corp. Lindsay told Rodriguez that he should stop sex playing with him and Corp. Smith-Thompson as well as with the inmates (p. 4); and in response, Respondent told him to "shut-up bitch". Complainant described the interaction as one in which the Respondent seem to treat the exchange as joking between officers, whereas Complainant was serious about the topic of discussion. Complainant also indicated that the Respondent left early that day on sick leave and complained that there seemed to be a pattern of him leaving early on sick leave whenever she complained to him about his conduct and threatened to file a formal complaint against him. Complainant also stated that she verbally complained to her super-isor, Sergeant (now Lt.) Profit about what was going on. Complainant testified that Lt. Profit told her to file a complaint against Respondent but that in her perception, Lt. Profit had now befriended Respondent and would probably defend him with regard to this matter. She also complained that Lt. Profit would tell what Complainant would share with her about Respondent's behavior to other people in the jail, however, Complainant does not believe that she ever talked to Respondent about his alleged behavior.

Complainant also indicated that she complained to Deputy Warden Corbett by sending him an e-mail (a copy of which is attached), but she does not recall the date of the e-mail and did not have a record of the date. She indicated that Corbett told her that if a matter involved sexual harassment that she needed to talk to the Special Inspector, not him and that nothing else was done about her complaints. She indicated that she

complained about other matters in addition to sexual harassment in her e-mail to Mr. Corbett and Mr. Corbett told her that he couldn't do anything with her e-mails unless she put it in a form by itself because of the other complaints about drugs and managers in her e-mail. Complainant indicated that she and Lindsay told

Respondent to stop his conduct repeatedly to no avail. Only the attached e-mail has been located. Complainant testified that on other occasions the Respondent has said things such as "I'm going to eat your pussy", "Let me suck your toes", "Pull your shoes off so that I can see how your toes look". She indicated that the statements were made in a joking manner and that Corporal Lindsay would some time laugh at the Respondent when he made these statements to her, but that she would not laugh or play along with the Respondent's conduct. Complainant also testified that Respondent would make inappropriate remarks to Corporal Lindsay such as "I want some of your head" or "I want some of your ass" when Lindsay would ask him if he wanted some food. (p. 39-40). In another incident, Complainant testified that the Respondent told Lindsay that he could make Lindsay's aching back better when Lindsay complained about his back by stating "Man, go on out there and lay on the table. I'm going into the bathroom and grease up. Once I fuck you in your ass, you'll be all right". Complainant also indicated that Respondent patted Lindsay on his buttocks several times (p. 51-52)
Complainant complained that Respondent would respond with something sexual to everything that she or Lindsay would say to him some times. Complainant said that Respondent would also engage in sexual play with the inmates.

Complainant testified the only time that the Respondent actually touched her since the dismissal of the first complaint was when he touched her breast. According to Complainant, the conduct would transpire for about forty-five minutes until she would threaten to file a report against the Respondent and that it occurred every time that she worked with the Respondent every week-end. (p.40). She testified that Respondent apologized twice for his behavior, but still continued the conduct afterwards (p.71-72). Complainant indicated that Respondent's behavior caused her to have to frequently leave the block and stay away from her work area just to getaway from him. She stated that she stayed away from the block more than she did in the block because of his behavior. Complainant testified that she also threatened Respondent that she would have her spouse come to the jail and beat him up if he did not stop his conduct (p. 41-42). Complainant testified that Corporal Lindsay is afraid to report the conduct, but asked her to communicate what the Respondent was doing to him also during this investigation (p. 43). She stated that she tried different strategies to try to get Respondent to stop his conduct ranging from ignoring it and leaving his space to threatening to file a written report against him. (p. 44). She stated that Respondent left early between three to four of the times that she threatened to file a written complaint against him. Complainant testified that she also heard that the Respondent was going to file a work related complaint against her after she filed her sexual harassment complaint, but that has not received any complaint (p. 57).

Complainant denies that she ever had any social or intimate relationship with the Respondent or that she ever held any special interest in having a relationship with him or that she ever flirted with him playfully or otherwise.

Complainant contended that Respondent would not engage in the conduct around anyone except Corporal Lindsay and herself, but that he would occasionally joke sexually with Sgt Stephens around also, but not as aggressively. (p. 50, 54). Complainant testified that Sgt Stephens told her that he had admonished the Respondent not to engage in sexual talk to Complainant on more than one occasion, but that he was ignored. (p.59). Complainant testified that she and Lt. Profit used to be friends and socialize outside of the jail, but that Lt. Profit stopped speaking to her after the Complainant filed the sexual harassment complaint. She also testified that Lt. Profit threatened that she was going to have Complainant fired for staying off the block too frequently. (p.55-56). Complainant testified that Respondent's behavior made her nervous and leave her work station on the block for prolonged periods of time to avoid being around the Respondent. She indicated that she would say that she had to go to the bathroom and then go and sit in her car for two hours or more during her shift (p.69). This in turn led to the threat of reprimand from her superior officer, Lt. Profit according to Complainant (p. 69). Complainant contends that Responded "keyed" her car after she filed this sexual harassment complaint against him. That matter has been reported to the Department of Corrections and the District of Columbia Police Department for separate investigation.

**Respondent Pablo Rodriguez**

The Respondent has worked for the Department of Corrections for six years. He has worked at the D Street location for approximately two-three years and worked at the Lorton facility prior to that. He is a corporal and serves as a corrections officer. He stated that Lt. Ames was his immediate supervisor; however Lt. Stevens was his OIC when he was stationed with the Complainant on the Northwest 2 Block. The Respondent received a satisfactory performance evaluation on his last evaluation in June, 2005. Respondent stated that he has had a contentious relationship with the Complainant since February, 2005 (p28). He stated that the contentious relationship was caused by the Complainant's propensity to spend excessive time outside of the cell block which created a hardship for the other officers on the block (p. 28). Respondent stated that he had compiled documentation of the excessive time that the Complainant spent outside of the cell block through the notations in the daily log book concerning exit and entry from the cell block. Respondent stated that Officers Washington, Tucker and Lindsay were also unhappy about Complainant's work conduct, but that they were afraid to speak up because of her reputation to file sexual harassment complaints against people (p. 29-30). The Respondent contends that the Complainant has had a chronic problem with absence from her work station even before she worked in the unit with him. He states that Officer Higginbotham and Corporal Miles have complained about her frequent absences from her work area. The Respondent brought log books for the time period between Februarys until June 18, 2005 to demonstrate what he characterized as a pattern of the Complainant to spend prolonged periods of time away from her work station (p. 33). Respondent made a formal written complaint to Sergeant Crawford about the Complainant's absences from

the block on June 18, 2005 (p. 32). Respondent stated that his complaint addressed June 10, 2005 when he said that the Complainant left the cell block at 11:30

A.M. and did not return until 2:50 P.M. depriving everyone else on the unit from getting a lunch break (p. 33). Respondent indicated that he also indicated in his Complaint that the log book appeared to contain a forged late entry after the log book was closed. Respondent believes that the Complainant forged the log book. He stated that although his complaint was about June 10, 2005, he did not get to formally lodge the complaint until June 18, 2005 when he returned to work (p. 33). However, Respondent stated that he advised Sgt. Profit about his complaint verbally on June 10, 2005. Respondent testified that he believes that the Complainant's real motive for filing her Complaint against him was because she knew that he was going to expose for forging the log book and make a complaint against her for her absences from her post ( p. 35). Respondent admits that he never personally complained to the Complainant that he did not like for her to take extended breaks away from the block (p. 90).
The Respondent said that when he gave his complaint form DC-1 form to Sgt Profit on June 23, 2005, he was told that the Complainant had already filed sexual harassment charges against him. He later found out that the sexual harassment complaint against the Respondent was filed by the Complainant on June 19, 2005. Respondent suggests that the Complainant saw him taking the log book to copy at the command center while she was working on floor control, figured out that he was about to file a complaint against her and accuse him of forgery, and decided to pre-emptively file the subject sexual harassment complaint against him instead ( p.36¬40, 41-45, 49, 55, 92). The Respondent also stated that he believes that Sgt Profit may have told the Complainant that he was going to file a complaint against her because he advised Sgt Profit verbally that he intended to file the report about the Complainant's three hour absence from her duty station when he returned to work again (p.50, 54, 55). He stated that he did not return to work again until June 23, 2005 (p. 50). Respondent indicated that Sgt Profit told him to do what he had to do (p. 53), but he believes that Sgt Profit and the Complainant may be "girlfriends" and "looking out for each other".

Respondent contends that the Complainant had already gotten into trouble for prolonged absences from her duty station previously and was required to take a leave slip for the time that she was out of the unit (p. 45). Respondent stated that other officers were upset with the Complainant about her conduct, but he only knew of a formal complaint being filed against the Complainant by one officer, Officer Higginbotham. Officer Higginbotham works during the same shift, but rarely on the same block as the parties. Respondent testified that Corporal Alvin Washington who works with the parties on the NW2 block has complained privately about the Complainant's prolonged absences from the unit during her shift (p. 46).
Respondent testified that the last time that he has worked with the Complainant is the day that he filed his Complaint on June 23, 2005. Respondent contends that he has not encountered the Complainant since she filed the complaint. He specifically denies that he scratched her car with his keys as alleged by her or that he confronted her in any way after she filed her complaint against him (p.99).

Respondent denies that the Complainant told him at any time between February and June 19, 2005 that she was going to file a complaint against him for sexual harassment before she filed the subject complaint (p.42. 88). Respondent also denies that he apologized to the Complainant if she had been offended by anything that he had said during the months of March, April, May or June. Respondent also denies that Lindsay ever asked him to stop talking to him in a particular way or that he was tired of the Respondent talking to him in a sexually inappropriate manner (p.89). Respondent contends that prior to learning from Sgt. Profit that a sexual harassment complaint had been filed against him that he was unaware that the Complainant had any problem with him at all ( p. 89).
He stated that the last time that he worked with the Complainant before her complaint was filed was June 18, 2005. Respondent also denies that the Complainant ever told him that she did not appreciate how he spoke to her (p. 43). Respondent denies that he ever made any sexual remarks or jokes to the Complainant or in front of the Complainant between the times the cease and desist order from her first complaint up until the filing of the second complaint on June 19, 2006 (p. 69, 77,). Respondent testified that he has never touched any part of the Complainant's body whether accidentally or deliberately (p. 77). Specifically, Respondent denies that he pushed her head toward his penis or told her that he wanted to suck her toes or engage in oral sex or put his penis into Corporal Lindsay's mouth as alleged by the Complainant ( p. 77, 78). Respondent also denies that he ever told sexual type jokes with other officers in the Complainant's presence between September, 2004 up until June 19, 2005 (p. 87). In fact, Respondent denies that he even tells jokes of any type while working. (p. 87).

Respondent also denies that he made any remarks of a sexual nature to Corporal Lindsay (p. 70). Complainant testified that he would tease Lindsay about a dance that Lindsay would do at times at the job and about some things that Lindsay would say that seemed to be out of context (p.70). Respondent denies that he ever made any remarks to Lindsay about what he could do to him, and specifically denies that he ever told Lindsay that he was going to grease up in the bathroom and straighten out Lindsay's back problems (p. 71). He specifically denies ever making any remarks about putting his penis in the Complainant's mouth or in Lindsay's mouth (p.72). Respondent also denied that he ever talked about sexual type jokes with inmates (p.72). Respondent claims that the only discussions about Lindsay that he had with Stephens or a_ly other officer about Lindsay was that they should help Lindsay with his family problems (p. 74).
Respondent said that Sgt Stephens warned him about what he said around the Complainant around the time of the first complaints and indicated that Stephens did not want to get involved with a sexual harassment situation on his unit because he was the OIC and up for promotion to sergeant at the time ( p.74). However, Respondent also stated that Stephens warned him that he should get off of the block or change his shift (p.75).

Respondent contends that he had a good working relationship with the Complainant when she first started working on the unit after returning from a RIF (p. 59). Respondent contends that in the early stages of their work relationship he and the Complainant did not talk to each

other about anything except home remodeling which he discussed with all of the other officers also (p.61). Respondent contends that the Complainant changed the tenor of their interactions when she called into the unit from a floor control and requested that Sgt. Stephens ask the Respondent a question for her. Respondent contends that Sgt. Stephens put the Complainant on the speaker phone and she asked him if he "ate pussy".    The Respondent states that he responded that he was married and asked her what was wrong with her, but that everyone around laughed. He admits that later he asked her whether or not she "suck dick" when he saw her in a joking manner and that she laughed in response (p.62).

Respondent testified that he regretted making the remark later and that after the exchange between them, the Complainant started treating him with hostility. Respondent states that he then called the sexual harassment office and filed a report about the interaction which was later resolved through mediation along with a complaint against him filed by the Complainant (p.62¬63). Respondent says that both the Complainant and he apologized to each other about their behavior before the cross-complaints were mutually dropped (p. 64).

Respondent also recalls an incident when he refused to talk to the Complainant when she called him on the phone in the unit, but indicates that he thought that the call was from his wife at the time and that he was too busy to take the call. (p.65). He believes that the incident occurred either before or after the sexual harassment complaint was filed by him, but he does not recall the date.

Respondent contends that the Complainant has a past history and reputation at the jail for filing bogus sexual harassment charges and that some officers think that she is crazy (p.79). Respondent stated that a former correctional officer, I. Robinson would serve as a witness to the fact that the Complainant filed a false sexual discrimination charge against him which was dismissed and that he in turn successfully sued the Complainant (p.80). Attempts were made to interview I. Robinson, but he did not wish to make himself available to be interviewed by this Investigator.

Respondent stated that he had a good working relationship with Corporal Lindsay and Sgt. Stephens (p. 104). However, Respondent believes that ever since the first charges were mutually dropped that the Complainant has waged a personal vendetta against him (P. 113). Respondent stated that the Complainant appeared to resent his authority or respect in the cellblock. He pointed out one incident when the Complainant was heard question who the Respondent thought that he was and stating that she was the only OIC there ( p.115). Respondent stated that Corporal Washington asked him what he had done to the Complainant because the Complainant had it in for him (p. 115). Respondent contended that Corporal Carolyn Tucker was also hearing similar negative comments about him from the Complainant (p. 117). He denies that there has ever been anything of a sexual nature between the Respondent and the Complainant (p. 113).

**Corporal Barry Bernard Lindsay**

Corporal Lindsay had been working for the Department of Corrections at the Lorton facility for approximately thirteen years before he was vacated by a reduction in force. He returned to duty as a senior corrections officer at the D.C. Jail in approximately July, 2004.     He has been assigned to primarily Northwest 2 block since returning to the Department of Corrections. Lt. Luis Stevens was Lindsay's OIC during the relevant time period of the events surrounding the complaint. Lindsay regularly worked with the Complainant on the Number two shift between 7:30 A.M. to 4:00 P.M.

Lindsay described the Complainant as a good co-worker but indicated that there is not social relationship between them outside of the workplace. Although Lindsay knew of Respondent at Lorton, he did not work closely with him until coming to the D.C. Jail. He does not socialize with any of the involved officers outside of work.
Lindsay testified that he witnessed the many of the events complained of in Complainants first complaint against the Respondent as well as the present complaint under investigation. However, he was never interviewed with respect to the first Complaint because it was dismissed after mediation before investigation.
Lindsay testified that he heard the Respondent did apologize to the Complainant in connection with the first complaint. He also indicated that Stevens talked to both the Complainant and the Respondent with respect to the first complaint (p. 26).
Lindsay testified that he has heard the Respondent saying things such as that he wanted to suck the Complainant's toes and that he witnessed an incident in the fall of 2004 when the Respondent grabbed the Complainant's head and pulled it toward his "private parts" (p. 29) which lead to Complainant's first complaint against the Respondent. He testified that the Complainant pulled herself away and admonished the Respondent, but the Respondent just laughed (p. 30).

Lindsay testified that all officers, including the Complainant and Respondent joked around, but that the Complainant did not willingly engage in sexual type jokes with the Respondent. He indicated that he never heard the Complainant say or initiate any type of conduct of a sexual nature to the Respondent (p.33). He stated that Complainant did respond to one of Respondent's comments about sucking her toes by stating "well, you sure can't do that, because my husband is the only one that do that." (p. 33). Lindsay testified that he specifically heard the Complainant tell the Respondent to please not disrespect her and talk to her like that (p.35).

Lindsay said that Respondent would engage in sexual play and joking with inmates also. He testified that Respondent made sexual remarks to him in front of inmates on one occasion, then on another occasion made sexual remarks to him in front of the Complainant (p. 35).

In the time period involved in the present investigation, Lindsay stated that he has personally witnessed the Respondent making unwelcome sexual comments to the Complainant. In approximately June, 2005, Lindsay observed Respondent making comments to Complainant about sucking and performing oral sex on her (p. 38-40). He stated that the Complainant made it quite clear that she did not appreciate him speaking

to her in that manner, but the Respondent laughed in response as though it was a joke (p. 41). Lindsay testified that Respondent made inappropriate comments and jokes to the Complainant and him almost every day that they worked together during the two months leading up to the filing of the Complaint by the Complainant ( p. 51). These remarks included remarks about sexual acts that he wanted to perform on both of them. For example, he testified that Respondent has told him that he wanted to put his penis in the Respondent's mouth (p. 69). He stated that sometimes the Respondent would make sexual gestures like motioning the zipper to his pants up and down in a sexually suggestive way. Lindsay said that initially he laughed along with the jokes because he thought that the Respondent was just kidding, but after some time he was sickened by them and told the Respondent so. He stated that although the Complainant also tried to ignore the comments and laugh some times also, she told the Respondent several times to stop the conduct between March and June, 2005 before she filed the complaint (p. 62). Lindsay stated that the reason that he had not filed a complaint against the Respondent is because he felt that it would look bad for a man to file a complaint against another man and because he knew that he had to keep working at the jail with him (p.70).

    Lindsay stated that the conduct affected him in such a way that he did not even want to come to work and that the Complainant had complained to him that it affected her in the same way (p. 70-71). However, he stated that it did not affect his ability to perform his job because he was able to block it out and focus on what he had to do. However, he stated that inmates also complained to him about the Respondent's conduct (p. 73). However, Lindsay noticed that Respondent would not make the sexual remarks around any other officers except for Stevens, the Complainant and himself (p.; 74). Lindsay stated that he had heard through jail gossip that the Complainant was the type of person who would file charges against someone very quickly (p. 80).
Lindsay was asked if he knew of any motive that the Complainant may have had to retaliate against the Respondent. He stated that before the first Complaint, the Complainant asked the Respondent to call the Respondent on the phone one morning and ask him if he wanted any breakfast because she was going out to buy breakfast. He stated that the Respondent responded on the intercom that he did not want to talk to "that bitch". Lindsay stated the Complainant heard the comment and that Complainant and the Respondent had an antagonistic relationship ever since that incident (p. 87). He stated that the Respondent started making the inappropriate sexual comments to the Complainant after that.

    Lindsay testified that about three-four months before the subject complaint was filed, Stevens gathered everyone in the unit together and told them that they should stop playing with each other with sexual jokes if they know that the other person does not like it because it was not allowed. He stated that Stevens also told them to try to resolve any animosity between them and work together (p. 63-65). Lindsay testified that after the talk the Respondent stopped engaging in the sexual conduct for several weeks, but after that resumed the inappropriate comments toward the Complainant and him when Stevens absent from work (p. 65).

Lindsay also independently corroborated the essence of the incident described by the Complainant when Respondent made an inappropriate sexual comment to Lindsay in her presence. He indicated that his back was hurting and that his doctor had given him some pain pills which resulted in him having difficulty moving and causing him to lean a little bit. He testified that Respondent said to him "Lindsay, your back still hurting?" When Lindsay responded that it was in fact hurting, he testified that Respondent responded by saying "'fell, you go and lay on the table and I'm gong to grease up and I'll come and straighten out your back".

Lindsay testified that he expressed his anger to Respondent about the inappropriateness of the remarks and that it was after this incident that the Complainant said that she was going to proceed forward with a complaint against the Respondent (p. 44). Lindsay stated that this was at least the second time that he had told Respondent to stop conducting himself in that manner toward him. Lindsay further testified that he told Stevens that he wanted to be moved out of the unit because of the Respondent's conduct not only toward him and other officers, but also toward other inmates. Lindsay also told Stevens that Respondent's conduct made him not want to come to work (p.44). Lindsay stated that the Complainant filed her complaint about two days after this incident (p.46).

**Sgt. Stephens**

Sgt. Stephens was the officer in charge of the NW2 block during the No. 2 shift when the alleged events giving rise to the complaint occurred. Sgt Stephens supervised the parties involved in this investigation. He has subsequently been promoted to Sergeant. He has worked for the department since 1986 and has been stationed at the D.C. Jail facility for approximately three years. He worked at the Lorton facility up until the time that it closed. Sgt Stephens had a good working relationship with both the Complainant and the Respondent He indicated that he and the Respondent have been friends for a long time (p. 31) and that they socialize outside of the job, have been to each other's homes and know each other's families (p. 57, 65, 72).

According to Sgt. Stephens, the parties were originally friends who used to tease and joke around with each other in a playfully flirtatious manner (p.26, 33, 44, 52). Stephens gave an example of how the Complainant announced that her husband being sent to Iraq and that she was going to be home alone. He stated that Respondent responded asking if he could come over in a joking manner. According to Stephens, both parties laughed at the exchange (p. 33). Stephens had the impression that the parties may have liked each other and were exploring whether or not a relationship would develop (p. 39), but does not believe that they ever had an affair with each other (p. 53-54). He recalls the Complainant asking the Respondent if he could "suck good pussy" and that the Respondent replied could she "suck a good dick" and that they both would laugh about it over the intercom (p. 39). This occurred during the time of the first case around in November, 2004. Stephens said that he did not prohibit the conduct between the parties because they both seemed to like it, except he told them to control their behavior in case a case manager came in the area and heard them playing in that manner ( p. 40-41). He also stated that he did tell them to stop playing around with each other on other occasions before the first complaints.

( p. 50). Stephens stated that the Respondent is a comical type of person who was known to joke often, including telling dirty jokes (p. 44, 57). He stated that to his knowledge all the officers in the block, including the Complainant would just laugh and joke along with the Respondent and with each other and gave no indication that they were offended (p. 44, 51, 57). Some of the comments that the Respondent made included that he wanted to suck her toes, suck her "pussy", that he for her to open her legs and that he wanted to put "his dick" in ( p. 100, 101). He also stated that the Complainant complained to him that the Respondent made sexual comments to Lindsay in her presence that she was also sick of also. An example was that when they were eating Respondent would say that he would put some nice cum in Lindsay's salad dressing for him (p. 101).

Stephens in connection with the first complaint that eventually the Complainant got angry and felt that the Respondent had gone too far in the type of comments that were being made to her and decided to file a sexual harassment complaint against the Respondent ( p.27). Stephens indicated that before Complainant filed her complaint he did not know that she felt insulted by comments made to her by the Respondent (p. 51).

It was Stephen's understanding that the Respondent filed a sexual harassment complaint against the Complainant also in order to protect himself because she had made similar comments to him also (p. 30). Stephens indicated that he tried to intervene and was successful in getting the parties to agree to mediate the first sexual harassment claims which they both filed against the other (p. 27). Stephens stated that when he was off duty, the parties would get into conflict over who had seniority and who was going to be in charge in his absence (p. 35). He stated that both parties would complain to him about the other to him when he returned on duty, but these complaints were about the operation of the cell block, not about sexual conduct (p. 36, 38, 47). Stephens also said that the Complainant told him that the inmates advised her that the Respondent talked about her to them behind her back (p. 120).

Stephens stated that he and Respondent confided in each other, and that Respondent never indicated to him that he had any sexual interest in the Complainant. Stephens also indicated that Respondent had a reputation as a good officer and worker (p. 56). Stephens admitted that he would be disappointed if something happened to the Respondent in connection with this case because he is a "good guy" (p. 66). Stephen's testified that the Respondent jokes with other officers, including him about homosexuality and admits that he has also joked about the subject himself (p. 73, 74, 75, 76). According to Stephens, Lindsay also participates in this type of joking with other men (p. 77-83). Stephens also said that the Respondent might have teased Lindsay with homosexual jokes because he in not a very macho type of man (p.78). Stephens testified that in June, 2005, when he returned to duty on June 26, 2005 Lindsay complained to him that he was tired of the Respondent's sexual comments ( p. 84). He stated that one of the comments Lindsay reported that was made by the Respondent concerned masturbating in Lindsay's food (p.84). Lindsay also reported Respondent's comment about going to the bathroom and greasing up and laying Lindsay down to straighten out Lindsay's back ache ( p. 85). Stephens stated that he thought that it was just another typical joke of the type that the Respondent and the other officers would make to each other ( p. 85).Stephens

contends that Lindsay had not complained about the Respondent's conduct toward him until on June 26, 2005 ( p. 87).

Officer Stephens says that he told the Respondent twice before the sexual harassment complaint was filed that she should stop playing around with the Complaint because she would file a sexual harassment complaint against him (p.91). Stephens testified that he admonished the Respondent to stop playing around with the Complainant twice, one of the time being in May, approximately one month before the subject complaint was filed (p. 91, 92, 116, 117, 121). He stated that the Respondent responded "You right, you right" (p. 92).Stephens stated that he also told Lindsay that he had warned the Respondent to stop playing with the Complainant and that Lindsay in turn told the Complainant (p. 93). Stephens said that he gave this warning to the Respondent because he personally heard the Respondent making sexual types of jokes, including to him, but not because the Complainant was complaining to him about the sexual remarks made to her (p, 118). Stephens does not know whether or not the Respondent changed his behavior after his admonishments to him (p. 118).

Stephens indicated that the Complainant had a hearsay reputation at the jail for filing complaints against people (p. 63). He also mentioned that he did not have any problems with co-workers on the block until after the Complainant came back to the jail (p. 121). However, Stephens admitted that the Complainant seemed to have an amicable relationship with the rest of her co-workers (p. 122). However, Stephens admitted that he had no reason to believe that the Complainant would just make up something about someone that wasn't true (p. 64). Stephens also indicated that the Complainant had told him before she filed the complaint that she just couldn't work with the Respondent anymore and that she was trying to get transferred off of the block to work somewhere else ( p. 104). However, Stephens said that the Complainant did not tell him the reason that she couldn't work with the Respondent anymore. The only specif c complaints that he recalled were that he smelled, was nasty, funky, that his hair smelled, he looked dirty and messy (p. 105). Stephens believes that the Complainant made a complaint about the Respondent's personal hygiene to the Deputy Warden and to Captain Ames several months before she filed the subject complaint (p. 105, 106). Stephens said that the Complainant also complained that the Respondent was taking too long lunch breaks and that he would complain that she was taking too long lunch breaks (p. 113).
Stephens also indicated that there was a time period when the Complainant worked as a relief officer for another post because she said that she did not want to work with the Respondent unless Stephens was present ( p. 112). However, Stephens indicated that it was not until after the complaint was filed that Lindsay and the Complainant told him that they were tired of Respondent talking in a sexually inappropriate way around them. He indicated that Lindsay told him that he had warned the Respondent to stop talking to him in that way any more (p. 113, 121).

## Lt. Gloria Profit

Lt. Profit served as a supervisory officer during the time period of the complaint. She was promoted from Sergeant to Lieutenant on June 26, 2005.Sgt Profit has worked for the Department of Corrections since 1982. She would often serve as an Acting

Lieutenant for the Northwest Two cellblock on three -four times per week during the period of time relevant to the complaint (p. 9). The Complainant testified that she complained to Lt. Profit about the Respondent's conduct prior to filing her complaint and that the lieutenant encouraged her to file the complaint.

Lt. Profit described herself as having a very good working relationship with the Complainant until recently. She has known the Complainant since she began with the Department of Corrections. She indicated that they also socialized outside of the job (P. 11). However, Lt. Profit stated that Lt. Profit had recently filed a claim against her with the deputy warden and the special inspector, but that the allegations do not relate to any type of sexual harassment charges (p. 12).

Lt. Profit stated that earlier in June and then again on June 17, 2005 the Complainant tried to talk to her about problems that she was having with the Respondent (p. 15, 17). Lt. Profit said that although she was an Acting Lieutenant at the time of the conversations that she did not allow the Complainant to talk to her about the subject (p. 15, 18). She indicated that she did not allow the conversation because she did not know what the Complainant's motive for talking to her might be (p. 16). She explained that the Complainant had a reputation for trying to make a record by talking to you so that this caused people to try to avoid her (p. 17). She also said that the Complainant had a propensity to "turn things around and make them out to look like, you know, you did something to her" (p. 20).

Lt. Profit testified that advised the Complainant about the first complaint against the Respondent, but that she never came to her for guidance with respect to the subject complaint (p. 19-20). Lt. Profit testified that the Respondent complained to her about the Complainant leaving the housing unit regularly for extended periods of time and thereby depriving other people of getting their lunch break. She stated that the Respondent presented her with affidavits from other officers in support of his claim (p. 22). Lt. Profit said that she reported the complaint to her captain who told her to just monitor the situation but not to process the DC-1 form submitted by the Respondent at that time. She testified that the Respondent made a verbal complaint to her on March 19, 2005, but that he did not submit the written form to her until later in the week on June 23, 2005 (p. 24, 29).

Lt. Profit also testified that on June 18, 2005 she discussed with Thompson that another officer, Barbara Higginbotham had complained about the Complainant leaving the housing unit for a prolonged period of time (p. 24). After being advised by the Complainant that the time period was her lunch break, she did not pursue it further until she received another complaint from the officer that the Complainant had left the unit for another prolonged period on the same day (p. 25). Lt. Profit testified that she talked to her Captain about the situation because she had been receiving frequent complaints about the Complainant leaving the unit too frequently and for prolonged periods of time, preventing other officers from getting a lunch break (p. 25). Lt. Profit stated that she filled out a DC-1 based on the complaint on June 18, 2005. However, Lt. Profit stated that she did not talk to the Complainant about the complaint that she received from the

Respondent about the same type of behavior on June 19, 2005 (p. 27) nor did she write a written report.

Lt. Profit stated that the Complainant did not mention anything about inappropriate comments from the Respondent to her when she talked to her about the complaint on June 18, 2005, however the Complainant made inappropriate comment exhibiting resentment about those who were complaining about her (p. 28, 29). Lt Profit stated that other officers were complaining about the Complainant leaving the unit for prolonged periods of time also and that the complaints had been made to her since March, 2005 (p. 30, 3 1).

Lt. Profit also stated that the Complainant had told her in April, 2005 about the incident in the when the Respondent allegedly grabbed the back of her head and put her face on his penis ( p. 40), but stated that the Respondent and she had discussed the matter and that it was no longer a problem (p. 41). Lt Profit said that the Complainant's report to her in April was the only time that she had heard anything about the Complainant and the Respondent (p. 41). She indicated that she was not aware of any incidents in the fall of 2004.

Contrary to the testimony of the Respondent, Lt. Profit stated that she did not tell Respondent that the Complainant had filed a sexual harassment complaint against him. She stated that the Respondent and another officer told her that the Complainant had filed a complaint against him after he filed his complaint about her leaving the housing unit for prolonged periods of time (p. 43, 47). Lt. Profit testified that she was instructed by Captain Burns not to do anything with the Respondent's complaint against the Complainant except to monitor it (p. 44).

Lt. Profit also contended that the Respondent had already made his allegation known to Lt. Profit before he submitted the written complaint. He also provided her with log books documenting the Complainant's absences from the housing unit. A copy of the written complaint no longer seems to be available (p. 46). Later in the investigation interview, Lt. Profit stated that union shop steward, Larry Bishop is the one who told her that the Complainant had already filed her complaint against the Respondent when he submitted his complaint against the Complainant and that it would be considered retaliation (p. 47, 48). Lt. Profit testified that the union steward stated that he was informed of the sexual harassment complaint against the Respondent by the Respondent (p. 64).

Lt. Profit also contradicted herself later in the interview and denied that the Respondent ever told her anything about the Complainant's sexual harassment complaint (p. 49). Later in the interview Lt. Profit also contradicted herself and stated that she may have let the Complainant know about the Respondent's complaint about her at the same time that she discussed Barbara Higginbotham's complaint on June 18, 2005 (p. 51, 59). She indicated that the Complainant knew that the Respondent was going to make a complaint against her about her absences from the housing unit (p. 51). Lt. Profit said that based on Captain Burns instructions, she never gave him the DC-1 that the Respondent

gave her complaining about the Complainant and she just monitored the situation (p. 59, 60).

Lt. Profit stated that she never witnessed the Respondent engage in any inappropriate behavior toward the Complainant but admitted that she was not in the housing unit at the same time as the Respondent (p. 53) and never saw the parties interacting with each other.   She admitted that she did not have knowledge one way or the other whether or not the Respondent engaged in inappropriate conduct toward the Complainant (p. 54).

## Alvin Washington

Corporal Washington is a senior correctional officer who has been with the Department of Corrections for nineteen years. He is presently stationed at the D.C. Jail and works in the Northwest 2 housing unit. Officer Washington stated that the Respondent told him that he might need him to be a witness for him in this case (p. 7). Washington works during the same shift on NW Two with the Complainant every Saturday (p. 35).

Officer Washington stated that around the time that the complaint was made by the Complainant, the Respondent had been gathering log books and pointing out to supervisors how the Complainant was taking excessive absences from the unit (p. 17). Washington stated that it is his opinion that the sexual harassment charges against the Respondent were brought by the Complainant because one of the supervisors let the Complainant know that the Respondent was about to make a written complaint against her about her absences and make an allegation about falsifying the log book to hide one of her prolonged absences (p. 17). Washington admits that his opinion is merely based on what he heard from other officers; however he admits that no one actually heard any officer tip the Complainant that the Respondent was going to file a complaint against her (p. 18). He stated that the belief at the jail is that Lt. Profit is the supervisor who warned the Complainant that the Respondent was going to make a complaint against her (p. 19). Washington admitted that it was rare that the parties and he were in the same space at the same time (p. 24). Washington stated that the Complainant frequently talked negatively about the Respondent's hygiene and about things that he did, but that he did not hear her complain about him making sexual comments to her (p. 26).

Washington also said that the Complainant used profanity while working (p. 26, 27). He stated that there was a lot of tensions between the parties after the first complaints were filed, even after they were dismissed (p. 27). Washington's observations were that the Complainant has a good heart and treated the Respondent like everyone else (p. 28). However, Washington felt that the Complainant put a wedge between the Respondent and Sgt. Stephens by playing one against the other although they had a good rapport before she joined the unit (p. 29).

Washington described the Respondent as a good worker whom he has never had a problem with in the unit. Washington stated that the Respondent just got upset when it appeared that the Complainant was trying to take advantage of everyone else (p. 32). He

stated that the Respondent and Stephens joke around often (p. 33), including "how guys talk" but that because Washington doesn't joke much, most people don't say much to him (p. 34). Washington never observed the parties joking around with each other (p. 35). He recalled an incident when the Complainant accused the Respondent of leaving under the pretense of being sick (p. 36).

Washington stated that he was familiar with the log book entry that the Respondent reported to Lt. Profit. He stated that after the log book had been closed out for the day and the next shift had started a late entry was made by the Complainant which stated that the Complainant returned to the unit at approximately 12:50 p.m. when she had in fact been gone from the unit much longer ( p. 37, 38). He stated that on the day in question, the Complainant returned to the unit much later and only stayed for about ten to fifteen minutes. Washington stated that anyone can make entries in the log book, but that he is the only one who normally makes the entries (p. 38). Washington stated that there is a feeling that although he believes that the supervisors know about the Complainant's conduct, nothing is done about it (p. 39). He believes that the Respondent's efforts to do something about it resulted in him facing sexual harassment charges (p. 40). Washington testified that the Complainant had a reputation as a trouble maker and that most people were afraid of her and wanted to stay away from her (p. 44). He stated that she is referred to as the sexual harassment queen (p. 44). He stated that he has been told to watch out for the Complainant (p. 45).

Washington testified that he was not aware of any tension between Lindsay and the Respondent, but that occasionally the Respondent would admonish Lindsay for not paying enough attention to his job (p. 47, 48). Washington stated that he warned the Respondent not to trust the Complainant (p. 48, 49). Washington stated that he was not sure, but that he had the impression at one point that the Complainant liked the Respondent but that the Respondent did not reciprocate because he was married and she was not his type (p. 49). Washington also recalled the occasion when the Complainant told the Respondent and others in the bubble that her husband was overseas in Iraq (p. 52). In his opinion, she seemed to be testing how the Respondent would react (p. 53). Washington stated that he never heard the parties talking about anything except for their homes to each other (p. 56), but he felt that officers do not engage in any kind of joking around him. Washington admitted that he does not know whether or not the allegations of Complainant's complaint are true or not based on his own personal knowledge (p. 60).

**Carolyn Tucker**

Officer Tucker is a corporal and has worked for the Department of Corrections for eighteen continuous years. She is assigned to the D.C. Jail, Northwest Two unit. During the no. two shift just as the parties. Corporal Tucker has a working relationship with both of the parties. The transcript refers to Corporal Tucker as Joanne Tucker in error. Tucker stated that she had no personal knowledge about the allegations of sexual harassment against the Respondent (p. 5). Tucker stated that she only worked at the same time that both of the parties were working about once per month. Tucker testified that on the occasions that she did have an opportunity to work with both of the parties, she was

only aware of just general conversation between them such as about lunch or what was going on in the room (p. 9).

Tucker's perception was that the parties were not very close to each other (p. 10). Tucker stated that the Respondent started complaining to her about the Complainant staying away from the unit for prolonged periods of time soon after the Complainant returned to work after her RIF (p. 10, 11). Tucker said that she complained to her supervisors also about being deprived of a lunch break because of the Complainant's prolonged absences from the unit (p. 11).

Tucker stated that the male officers in the unit, including the Respondent would on occasion talk about females that they liked on a television show and other "male" talk about females in general (p. 15). She stated that the talk would be in hearing distance. She stated that the Respondent was nice and friendly and liked to joke around (p. 17). She further stated that some of the Respondent's jokes could be a little embarrassing but that they are all adults (p. 23). She stated that the Respondent would also make remarks to her about how good she looked on a particular day (p. 23). Tucker also testified that the Respondent did make jokes about homosexuality with Officer Lindsay and to inmates in the jail (p. 24). However she stated that the inmates joked that all of the male officers were gay so that she did not take such talk seriously (p. 25, 26).

Tucker stated that there was more tension between the parties than between other officers in the unit (p. 16). However she stated that sometimes the parties got along and other times they were at each other (p. 34). Tucker stated that she could not be certain or recall whether or not the Respondent ever said anything sexually inappropriate to the Complainant (p. 19). However, Tucker stated that the Complainant did tell her that the Respondent engaged in inappropriate sexual banter (p. 19, 20, 21).
Tucker also stated that Officer Lindsay also complained to her about the Respondent making inappropriate sexual remarks to him some time before Memorial Day in 2005 ( p. 22). She testified that Lindsay told her that he told the Respondent to stop talking to him in an inappropriate sexual manner and that she also heard him tell the OIC Stephens that he told the Respondent to stop his conduct (p. 27). Tucker could not be sure but she said that she thought that Stephens did tell the Respondent to stop his conduct (P. 27). Tucker remembered Stephens speaking to all of the officers as a group about being mindful about sexual harassment (p.30).

## VI. Analysis

Sexual harassment is prohibited in the work place by Title VII as a form of sexual discrimination. Meritor Savings Bank v. Vinson, 477 U.S. 57 (1986). Sexual Harassment is also prohibited by the D.C. Human Rights Act of 1977, as amended, DC Code, Section 2.1401 et seq and the policy of the Department of Corrections as set forth in the June 21, 2004 Program Statement .

The category of sexual harassment applicable to the allegations of this complaint is characterized as "hostile work environment". Hostile work environment is defined as

sexual harassment in which unwelcome conduct of a sexual nature has the purpose or effect of unreasonably interfering with an employee's job performance or creates an intimidating, hostile or offensive work atmosphere. The behavior can be verbal, non-verbal or physical in nature and can be engaged in by either a co-worker or a supervisor. In the instant case there is persuasive testimony from two witnesses, the Complainant and Officer Lindsay that the Respondent regularly engaged in inappropriate verbal conduct of a sexual nature directed toward the Complainant and Officer Lindsay in the presence of the Complainant for a period spanning approximately four months. The type of remarks that the Respondent is alleged to have made as described in this report were both objectively offensive and said to be offensive to both the Complainant and Corporal Lindsay.

The Complainant has stated that the conduct interfered with her ability to do her job because she felt compelled to leave her unit to avoid the Respondent and sometimes felt it difficult to even come to work. She testified that sometimes she would just go sit in her car just to get away from the Respondent. This conduct led to resentment toward her from her fellow officers and even warning from her superior officers. Moreover, the type of sexual remarks alleged to have been made by the Respondent on a daily basis for at least four months as described in this report would create an offensive work environment regardless whether or not the Complainant's absences from her unit were caused by the Respondent's behavior which is a factual issue in the case.

The fact that the Respondent engaged in this conduct is corroborated indirectly by Sergeant Stephens and Corporal Tucker. Sergeant Stephens testified that the Respondent does engage in sexual type play and jokes and that Corporal Lindsay did complain to him about the Respondent's conduct before the complaint was filed. Corporal Tucker also had heard the Respondent engaging in joking and conversation of a sexual nature with other male officers and inmates. She also confirmed that both Corporal Lindsay and the Complainant complained to her about inappropriate sexual comments made by the Respondent to them.

Respondent categorically denies that he engaged in the alleged conduct and denies that he ever even jokes or plays around in any manner while working. Respondent's credibility is diminished by his general denial. Sergeant Stephens who has described the Respondent as a friend and a subordinate admitted that the Respondent engages in sexually suggestive joking and playing and even testified that the Respondent playfully directs some of his comments directly at him. Both Officers Lindsey and Tucker testified that the Respondent is known as someone who likes to joke and play around and that some of the jokes are sexual in nature.

There was tension and conflict between the Complainant and the Respondent concerning work issues such as seniority which were unrelated to the allegations of sexual harassment. However, it appears that it is not unusual for officers to have work-related tension between them concerning the operation of the cell block. Although the ongoing animosity between the parties dictates that the Complainant's allegations be examined with great scrutiny, no such animosity seemed to exist between the Respondent

and the other witnesses who provided corroboration of Complainant's allegations. Therefore, there is insufficient evidence that the allegations were fabricated by the Complainant for vindictive purposes.

A more difficult issue in the case is whether or not the conduct was unwelcome on the part of the Complainant. There was testimony from Sergeant Stephens that the Complainant engaged in some of the sexual playing and joking with the Respondent herself at some point in their relationship. Corporal Lindsay also acknowledged that there were times that the Complainant laughed with the Respondent when he was making sexual jokes as did he. It is well established that "welcomeness" is not the same as "voluntariness". An employee may voluntarily accede to an environment of sexual banter and conduct out of a desire to get along with co-workers and for a variety of other reasons, but this does not mean that the conduct is welcome. Also, an employee may accede to certain sexual conduct for a time, but then change his or her mind and decide that they no longer wish to participate or tolerate the conduct.

The inquiry is whether the employee indicated by his or her conduct that the alleged sexual conduct was unwelcome. Corporal Lindsay corroborated the Complainant's testimony that there came a point in time before the filing of the complaint when the Complainant did tell the Respondent quite explicitly that she did not wish for him to continue speaking to her in a sexually explicit manner. Corporal Lindsay also testified that he also requested the Respondent to stop making sexually inappropriate remarks to him also. These remarks were made in the presence of the Complainant on more than one occasion. Hostile work environment encompasses both behavior directed at the Complainant as well as behavior directed at other employees in her presence. It is also significant that Sergeant Stephens specifically admonished the Respondent to stop making sexual jokes to the Complainant twice, one of the occasions being only one month before the complaint was filed. However, other than the denial of the Respondent, the evidence is that the Respondent continued to engage in the conduct up until the time that the complaint was filed by the Complainant on June 19, 2005. The corroborating testimony of Corporal Lindsay is particularly compelling because there has been no evidence of any ulterior motive that he might have for giving his testimony. In fact, according to his testimony and that of the Complainant; he was reluctant to come forward with the testimony because he felt that it was embarrassing for him as a male and wanted to avoid tension amongst his co-workers at the jail. It is also noteworthy that Sergeant Stephens found the report to him about the Respondent's remarks to Corporal Lindsay about letting him grease up and help him with his headache previously discussed in this report easily believable and the fact that it was reported to him as soon as he returned to duty within several days after the occurrence.

Also, Sergeant Stephens did not deny that the Respondent had a propensity to make jokes of the nature described by the Complainant and Lindsay or that such banter by the Respondent took place on the unit, but just felt that the jokes were well intended and that they were generally not objected to by his co-workers. However, once Sergeant Stephens became aware that there was objection to the remarks, he advised the Respondent not to engage in the conduct in the presence of the Complainant or Corporal

Lindsay who also lodged an objection. It is also significant that Lt. Profit testified that the Complainant tried to talk to her about the conduct of the Respondent in early June, 2005 but she would not allow her to do so.

Respondent and several witnesses suggest that the Complainant fabricated the sexual harassment charges in order to deflect from her own objectionable conduct with respect to absences from the unit, including possible alteration of the unit's activity log book to hide one of her prolonged absences. If true, then the Complainant did not stay away from her unit because of the conduct of the Respondent, but used the alleged conduct of the Respondent as an excuse for her absences. The Respondent, Lt. Profit and Corporal Washington expressed the opinion that the Complainant initiated her complaint after she found out that the Respondent was going to file a complaint against her about her absences and accuse her of falsifying the log book. However, upon interrogation, these witnesses did not provide a sufficient factual basis for their opinion. The sexual harassment complaint was filed on June 19, 2005 before the Respondent lodged his written complaint against the Complainant on June 23, 2005. Respondent, Corporal Washington and Lt. Profit postulate that the Complainant found out from a supervisor that the Respondent was going to make his complaint before she filed her complaint, however, Lt Profit initially testified that she did not tell the Complainant about the Respondent's verbal complaint to her about the Complainant on June 19, 2005 and gave conflicting testimony concerning how she found out about the sexual harassment complaint and what information she shared with the Complainant and at what time. It is also worthy of note that Lt. Profit testified that she was the subject of a complaint by the Complainant now and expressed her lack of trust of the Complainant. Corporal Washington admitted that his views were all premised on what he had heard and not on personal observation.

Respondent also suggests that the Complainant's testimony should be disregarded because she had a propensity to file complaints against other officers and had a reputation as a trouble maker whom others did not trust. Respondent indicated that the Complainant filed a complaint against a former employee at the Department of Corrections, I. Robinson, which was dismissed and the subject of a civil suit against the Complainant, but when contacted, the witness was not willing to make him self available to the investigator for an interview when he was contacted and there was no record of the complaint found by the office of the Special Inspector. Upon search by the Office of the Special Inspector, the only other sexual harassment complaints filed by the Complainant on record are: the first complaint of sexual harassment filed by the Complainant against the Respondent in November, 2004; a complaint of retaliation against Patricia Britton, Jerome Jones, Gary Brinson and Betty Ames on April 25, 2001 and a retaliation complaint against Patricia Britton on April 25, 2001. The Complainant also actively participated in the Bessie Neal case.

Moreover, each allegation of sexual harassment must be judged on its own merit and although frequent allegations of sexual harassment by the same individual which are found to be without merit may cause new allegations to be examined with greater

scrutiny, certainly is not reason to disregard the new allegations as without merit on that basis alone.

In the instant case, the allegations of the Complaint were examined with great scrutiny because of the past history between the parties and the unrelated conflicts occurring at the job involving the Complainant during the same time frame as the events alleged in the complaint. However, the corroborating testimony of the witnesses supports the conclusion that by a preponderance of the evidence, the Respondent did engage in sexual harassment by behavior that created a hostile work environment for the Complainant and at least one other employee as alleged in the complaint.

## VII. Recommendation

After careful review of the evidence in the case, the testimony of all relevant witnesses, the applicable law and the policy of the Department of Corrections against sexual harassment, it is recommended that a probable cause finding be made with regard to the claim of hostile work environment by Charlene Smith-Thompson.

# IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

CHARLINE SMITH-THOMPSON )
)
      Plaintiff )
)
v. )  Case No:006354-06
)
PABLO RODRIGUEZ, et al )
)
      Defendants )



RECEIVED
Civil Clerk's Office

NOV 3 0 2006

Superior Court of the
District of Columbia
Washington, D.C.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MOTION FOR LEAVE TO FILE AMENDED COMPLAINT

COMES NOW, the Plaintiff, Charline Smith-Thompson, by and through her attorneys, Jay P. Holland, Brian J. Markovitz and the law firm of Joseph, Greenwald & Laake, P.A., and pursuant to Sup.Ct.R.Civ.P. 15 moves to amend Plaintiff's Complaint in this matter, and in support thereof, states as follows:

1. Plaintiff seeks to amend her complaint setting forth transactions and occurrences that have occurred since the filing of her original complaint and to correct factual information in her original filing.

2. Plaintiff's proposed Amended Complaint relates to the underlying issues raised in the Plaintiff's original Complaint, is necessary to clarify legal issues directly related to the claims in the Complaint, and is crucial to this Court's ability to make the most well-informed decision on the pleadings before it.

3. Plaintiff has never previously sought to amend her Complaint. Defendants will suffer no prejudice as a result of the proposed amendment, and granting Plaintiff leave to amend is in the interests of justice and should be freely granted. *See Gordon v. Raven Sys. & Research*, 462 A.2d 10 (D.C. 1983) (leave to amend should be freely granted).

4. Pursuant to Rule 15, Plaintiff requested Defendants' consent to file the proposed Amended Complaint, and Defendants through counsel stated that they take no position

EXHIBIT
tabbies'
2

Joseph
Greenwald
& Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane • Suite 400
enbelt, Maryland 20770

'1) 220-2200 • Fax 220-1214

on this motion at this time.

WHEREFORE, the Plaintiff moves this Court for leave to file the proposed Amended Complaint and for such other and further relief as the Court deems appropriate.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.


By: _____
Jay P. Holland  (Bar No. 422258)
Jholland@jgllaw.com
Brian J. Markovitz (Bar No. 481517)
Bmarkovitz@jgllaw.com
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
(301) 220-2200
(301) 220-1214 (facsimile)
Attorney for Plaintiff


POINTS AND AUTHORITIES

Gordon v. Raven Sys. & Research, 462 A.2d 10 (D.C. 1983)

Sup. Ct.R.Civ.P. 15

)seph
Greenwald
& Laake

:ph, Greenwald & Laake, P.A.
)4 Ivy Lane   •   Suite 400
enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Motion for Leave to Amend Complaint and Amended Complaint were sent by first class mail on November 30, 2006 to:

Kimberly M. Johnson
Melvin W. Bolden, Jr.
Assistant Attorney General
441 Fourth St., N.W.
Sixth Floor South
Washington, D.C. 20001

_____
Jay P. Holland, Esq.

oseph
   Greenwald
       & Laake

:eph, Greenwald & Laake, P.A.
04 Ivy Lane • Suite 400
eenbelt, Maryland 20770

)1) 220-2200 • Fax 220-1214

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

CHARLINE SMITH-THOMPSON )
)
       Plaintiff )
)
v. ) Case No:006354-06
)
PABLO RODRIGUEZ, et al )
)
)
       Defendants. )
*******************************************************************

### O R D E R

UPON CONSIDERATION of the Motion for Leave to File Amended Complaint filed

by the Plaintiffs' herein, it is this _____ day of _____, 2006, by the

United States District Court for the District of Columbia,

      **ORDERED**, that the Plaintiff's Motion for Leave to File Amended Complaint be and

hereby is **GRANTED;** and it is further,

      **ORDERED** that Plaintiff's proposed Amended Complaint be and hereby is

**ACCEPTED** in its entirety for filing purposes.

                                _____

                                  JUDGE, Superior Court
                                  for the District of Columbia

)seph
**Greenwald**
**& Laake**

eph, Greenwald & Laake, P.A.
>4 lvy Lane • Suite 400
:enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

Copies to:

Jay Holland, Esq.
Brian J. Markovitz, Esq.
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770

Kimberly M. Johnson
Melvin W. Bolden, Jr.
Assistant Attorney General
441 Fourth St., N.W.
Sixth Floor South
Washington, D.C. 20001

oseph
    Greenwald
        & Laake

seph, Greenwald & Laake, P.A.
!04 Ivy Lane   •   Suite 400
reenbelt, Maryland 20770

01) 220-2200 • Fax 220-1214

## IN THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA

CHARLINE SMITH-THOMPSON )
8107 Foxhall Road )
Clinton, MD 20735 )
)
)
Plaintiff )
)
v. )
) Case No: 006354-06
)
PABLO RODRIGUEZ )
24 Sun Croft Court )
Silver Spring, MD 20904 )
)
and, )
)
THE DISTRICT OF COLUMBIA )
John A. Wilson Building )
1350 Pennsylvania Ave., N.W. )
Washington, DC 20004 )
)
Serve:  Mayor Anthony Williams )
Office of the Mayor )
John A. Wilson Building )
1350 Pennsylvania Avenue, NW )
Washington, DC 20004 )
)
and )
)
Robert J. Spagnoletti )
Attorney General )
Office of the Attorney General )
1350 Pennsylvania Avenue NW, )
Suite 409 )
Washington, DC 20004 )
)
Defendants )
*************************************************************************

### AMENDED COMPLAINT

COMES NOW, the Plaintiff, CHARLINE SMITH-THOMPSON, by and through her

attorneys, Jay P. Holland, Brian J. Markovitz and the law firm of Joseph, Greenwald & Laake,

seph
Greenwald
& Laake

ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

) 220-2200  •  Fax 220-1214

P.A., and sues the Defendants, PABLO RODRIGUEZ and THE DISTRICT OF COLUMBIA and for cause states the following:

## JURISDICTION AND VENUE

1.    The jurisdiction of this Honorable Court is invoked by virtue of the fact that this action is a Sexual Harassment case under The District of Columbia Human Rights Act D.C. Code Ann. §2-1401.01, *et. seq.*  Said Sexual Harassment occurred within the boundaries of The District of Columbia and DC ST § 11-921 confers jurisdiction upon this Court in a civil action in the District of Columbia.

## PARTIES

2.    Plaintiff Charline Smith-Thompson is an adult who resides at 8107 Foxhall Road, Clinton, Maryland 20735.

3.    Defendant Pablo Rodriguez is an adult who resides at 24 Sun Croft Court, Silver Spring, Maryland 20904.

4.    The District of Columbia Department of Corrections is a Department within the Government of Defendant District of Columbia located in the John A. Wilson Building at 1350 Pennsylvania Ave., N.W., Washington, DC 20004.

5.    The District of Columbia is a governmental entity subject to the jurisdiction of this court pursuant to DC ST § 11-921; DC ST §2-1403.03;  and DC ST §1401.02.

## FACTS COMMON TO ALL COUNTS

6.    Plaintiff Charline Smith-Thompson is a correctional officer and has been stationed at the District of Columbia Jail (D.C. Jail) with the District of Columbia Department of Corrections (DOC) since 1989.

seph
Greenwald
& Laake

:ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

l) 220-2200 • Fax 220-1214

2

7.     The Plaintiff was on disability leave from July of 2001 and then was laid off from the Department before her return in 2002 due to a reduction in force (RIF).  However, she was rehired to full time duty in September of 2004 and was stationed at the D.C. Jail where she returned to duty.

8.     Upon her return to duty, Ms. Smith-Thompson began working directly with Defendant Rodriguez.

9.     Defendant Rodriguez has been with the DOC since 1990.

10.    Plaintiff Smith-Thompson and Defendant Rodriguez were both supervised by Sergeant Luis Stephens.  Corporal Barry Bernard Lindsay also worked in the same cell block during Plaintiff's and Defendant's shift.

11.    The first sexual transgression committed by Defendant Rodriguez occurred soon after Plaintiff began working with him in 2004.  In one incident, Defendant Rodriguez grabbed the Plaintiff's head as she was sitting in a chair near him and tried to push her head onto his "private parts."  In another incident, Defendant Rodriguez called her asking her about oral sex while broadcasting the call over the intercom.

12.    When Plaintiff complained to Sergeant Stephens, Stephens told her that he had admonished Defendant Rodriguez to stop speaking in a sexually explicit way when he was around the Plaintiff.

13.    Later in 2005, Ms. Smith-Thompson was asked by Stephens and Special Inspector Carolyn Lerner to give Defendant Rodriguez another chance "since he was remorseful for his conduct and [also] a newlywed such as herself."  Soon thereafter, however, Defendant Rodriguez started engaging in the same conduct again.  In one incident, Defendant intentionally reached out and touched the Plaintiff's breast.

seph
**Greenwald
& Laake**

ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
:nbelt, Maryland 20770

) 220-2200 • Fax 220-1214

3

14.    Another coworker, Corporal Lindsay who is a male, was also sexually harassed by Defendant Rodriguez.  Corporal Lindsay objected to the harassment.  At one point, he told Defendant Rodriguez that he should stop "sex playing" with him and Plaintiff Smith-Thompson, as well as with the inmates.  To which Rodriguez responded, "shut up bitch."

15.    In June 2005, Plaintiff twice complained to her supervisor, Lieutenant Gloria Profit, about being harassed.  Lt. Profit, although being a higher rank than Plaintiff and also a supervisor, said she could not help Plaintiff.

16.    Ms. Smith-Thompson also complained about the Defendant's behavior to Deputy Warden Corbett by sending him an e-mail.  In response to her email, Deputy Warden Corbett told Plaintiff that, if a matter involved sexual harassment, she should talk to the special investigator and not to him.  No further action was taken by management about her complaints.

17.    In fact, Plaintiff was informed by several managerial employees, including the Warden that all sexual harassment complaints had to proceed through the Special Investigator who was court-appointed by the Honorable Royce C. Lamberth, United States District Court Judge.  Specifically, Plaintiff was informed that she had to "go through" the Special Investigator the Warden once, by the Deputy Warden, Corbett, three separate times including while trying to file complaints with him; and by Major Stanley Waldren, again while trying to file a complaint.  The Special Investigator was appointed as a result of a previous class action case for sexual harassment, against the Department of Corrections.

18.    Defendant Rodriguez continued his harassment of Plaintiff Smith-Thompson by making statements such as, "I'm going to eat your pu***y," "let me suck your toes," and

seph
**Greenwald
& Laake**

ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
:mbelt, Maryland 20770

) 220-2200  •  Fax 220-1214

"pull your shoes off so that I can see how your toes look." On another occasion, Defendant Rodriguez asked the Plaintiff whether or not she "suck[s] d**k."

19.    Plaintiff also overheard Defendant Rodriguez make inappropriate comments to other correctional officers. In one exchange between Corporal Lindsay and Defendant Rodriguez, when Lindsay was complaining about his aching back, Rodriguez stated, "Man, go on out there and lay on the table. I'm going into the bathroom and grease up. Once I f*** you in your ass, you'll be all right."

20.    Frequently, whenever either Plaintiff Smith-Thompson or Lindsay would say something to the Defendant, he would respond with some sexual innuendo. This kind of conduct would go on for about forty-five minutes at a time until the Plaintiff would threaten to file a report against the Defendant. This happened every weekend Plaintiff worked with Defendant Rodriguez.

21.    Defendant Rodriguez's behavior caused Plaintiff to be nervous and frequently forced her to leave her work station on the block for prolonged periods of time to avoid being around the Defendant. Plaintiff would be forced to excuse herself saying that she had to go to the bathroom and then go and sit in her car to avoid the hostile environment that Rodriguez had created.

22.    Lt. Profit threatened Ms. Smith-Thompson, saying she was going to have her fired for staying off the block too frequently when she was avoiding Defendant Rodriguez. However, as noted, Lt. Profit took no action to stop the harassment.

23.    After witnessing several encounters between Plaintiff and Defendant Rodriguez, Sergeant Stephens, the officer in charge on Plaintiff's cell block, told the Plaintiff that he had

)seph
Greenwald
& Laake

:ph, Greenwald & Laake, P.A.
)4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

1) 220-2200  •  Fax 220-1214

admonished Rodriguez on more than one occasion not to engage in sexual talk, but that his orders were ignored every time.

24.    Sergeant Stephens witnessed many of the exchanges complained of by the Plaintiff and had to endure many of the Defendant's sexually suggestive interactions himself.  For example, Defendant told Stephens that he wanted to put Stephens' penis in his mouth.  He also made sexual gestures and zipped and unzipped his pants.  In another instance, while Plaintiff Smith-Thompson was eating lunch and Defendant Rodriguez and Sergeant Stephens were present, Rodriguez commented to the Plaintiff that he would "put some nice cum in Lindsay's salad dressing for him."

25.    Corporal Lindsay publicly stated that the Defendant's behavior made him not want to go to work.  However, he was uncomfortable filing a complaint against Rodriguez because he felt it would look bad filing a sexual harassment complaint against another man, and he did not want to suffer more humiliation if word got out about his complaint.

26.    Sergeant Stephens also overheard some of the comments that Defendant Rodriguez made to Plaintiff, including Rodriguez wanting to "suck her toes," "suck her p***y," and that he asked her to "open her legs" so he could "put his d**k in."

27.    On or about March 20, 2006, an internal investigation was launched by Inspector Inga A. Watkins with the Office of the Special Inspector for the District of Columbia Department of Corrections.

28.    A report was generated from the above mentioned investigation, which stated that a "probable cause finding be made with regard to the claim of hostile work environment."

29.    Additionally, Ms. Smith-Thompson has attempted to file a complaint with the District of Columbia Office of Human Rights (OHR).  The OHR refused to process her claim

)seph
Greenwald
& Laake

:ph, Greenwald & Laake, P.A.
34 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

l) 220-2200 • Fax 220-1214

6

because they said that she had already received a favorable opinion from the Office of the Special Inspector with the DOC.[1]

30.    Ms. Smith-Thompson has also complained about the harassment with the Equal Employment Office within the DOC.

31.    Despite the findings of this investigation, Defendant Rodriguez continues to work in his original job with the DC Jail within the DOC.

32.    Ms. Smith-Thompson has visited a hospital complaining of headaches, and chest pain. There she was diagnosed with non-cardiac chest pain and was referred to two doctors for psychotherapy, one of whom has initiated treatment with two prescription drugs.

33.    Ms. Smith-Thompson was evaluated by the DOC psychiatrist (on July 13, 2006) for an independent medical exam (IME). In the IME, the psychiatrist, diagnosed her as suffering from Major Depressive Disorder manifest by a blunting affect, a depressed mood, anhedonia, hypersomnia, anorexia, weight loss. She has also suffered hair loss and has a stress-related ulcer.

34.    The psychiatrist recommended the following: (1) that she be separated from working with Defendant Rodriguez because her symptoms are related to Mr. Rodriguez's harassing conduct in the workplace; (2) that after 3-4 weeks of treatment she will be able to return to modified, accommodated, light duty (3) that if Ms. Smith-Thompson is returned to the DC Jail and continues to be harassed, she will experience an exacerbation of her symptoms.

35.    Despite these recommendations by DOC's own medical personnel, it continues to retaliate against Ms. Smith-Thompson by insisting that she continue to work at the DC Jail with Mr. Rodriguez, the harasser; and retaliating by failing to provide any light duty position despite the recommendation of its own medical personnel.

:ph
Greenwald
& Laake

:ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

---

[1] Ms. Smith-Thompson has filed charges of discrimination with the EEOC.

36.    Additionally, while she works at the DC Jail, many of her co-workers tell her that she did the wrong thing by filing a complaint against Mr. Rodriguez, and she continues to treated with distrust and condescension.  This in turn exacerbates her symptoms and stress.

37.    Furthermore, the DOC has refused to put her on light duty and refused to separate her and the harasser.

38.    On May 21, 2006, Plaintiff was forced stop working as a result of her experiencing headaches, chest pain, and depression.

39.    However, despite her doctor's explanation and recommendations, the DOC placed Ms. Smith-Thompson on a status of "absent without leave" (AWOL), a clear retaliation.  This happened even though Defendant DOC's own medical personnel recommended against her working with the harasser.

40.    Ms. Smith-Thompson is now absent from work without pay and fears returning to work if she has to work in the same environment with the man who sexually assaulted her and her peers and managers who blame her even though she is the victim.

41.    Ms. Smith-Thompson was told to report back to duty on or about November 27, 2006.  Upon returning, she was further harassed and retaliated against by co-workers and supervisors.  Within two (2) hours of reporting to work on that date, the Major on duty instructed her to leave the premises and go home.  She did as instructed.

## COUNT I
## (SEXUAL HARASSMENT – DC HUMAN RIGHTS ACT)

42.    Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 through 41 as if fully set forth herein.

43.    Sexual Harassment is prohibited in the workplace by the District of Columbia Human Rights Act as a form of sexual discrimination.  D.C. Code Ann. § 2-1401.01, *et. seq.*

oseph
Greenwald
& Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

44.  Defendant Rodriguez created a hostile work environment through all of his sexually explicit conduct mentioned above.

45.  Furthermore, the Plaintiff and other co-workers asked Defendant Rodriguez and management personnel to stop Rodriguez's sexual touching, language, and innuendo evidencing the unwelcome nature of this sexual conduct.

46.  Despite Plaintiff Smith-Thompson's complaints to many levels of supervisors within the DOC regarding Defendant Rodriguez's behavior, the sexual harassment did not stop.

47.  Defendant DOC not only failed to discipline and restrain the unwelcome sexual conduct of its employee, Defendant Rodriguez, but it also retaliated against Plaintiff by: allowing the hostile work environment to continue; refusing to separate her from her harasser (Rodriguez); allowing Defendant Rodriguez to continue working at the D.C. Jail undisciplined; refusing to permit Plaintiff to return to work on light duty, despite the recommendations of medical personnel; putting the Victim-Plaintiff on unpaid, "AWOL" status; and further harassing her and instructing her to leave the premises when she attempted to return to work.

48.  The discrimination and retaliation are continuous and on-going as stated herein.

49.  Plaintiff was forced to stop going to work with DOC because of her chronic headaches, chest pain and depression caused by the hostile environment created by Defendant Rodriguez and Defendant District of Columbia in violation of the DC Human Rights Act § 2-1401.01, *et. seq.*

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees

seph
**Greenwald**
**& Laake**

ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

) 220-2200  •  Fax 220-1214

and costs, and further and additional relief as the nature of the case may require and which

this Honorable Court shall deem just and proper.

## COUNT II
### (RETALIAION – DC HUMAN RIGHTS ACT)

50.   Plaintiff adopts and incorporates by reference the allegations contained in

paragraphs 1 through 49 as if fully set forth herein.

51.   It is unlawful business practice to retaliate against an employee who engages in a

protected activity under the DC Human Rights Act, D.C. Code Ann., §2-1401.01 *et. seq.*

52.   Ms. Smith-Thompson engaged in a protected activity under the DC Human Rights

Act when she reported the sexual harassment and hostile work environment to her

supervisors.

53.   Ms. Smith-Thompson also participated in an investigation associated with her sexual

harassment claims.

54.   Plaintiff was retaliated against for her complaints against her co-workers when the

DOC refused to separate her from her harasser, Mr. Rodriguez, and refused to put her on

accommodated, light duty at the request of DOC's own physician.

55.   Plaintiff was further retaliated against when she was placed on unpaid absent

without leave status by Defendant DOC rather than accommodating Ms. Smith-Thompson's

worsening stress-related symptoms.

56.   Defendant DOC not only failed to discipline and restrain the unwelcome sexual

conduct of its employee, Defendant Rodriguez, but it also retaliated against Plaintiff by:

allowing the hostile work environment to continue; refusing to separate her from her harasser

(Rodriguez); allowing Defendant Rodriguez to continue working at the D.C. Jail

undisciplined; refusing to permit Plaintiff to return to work on light duty, despite the

oseph
Greenwald
& Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane  •  Suite 400
cenbelt, Maryland 20770

1) 220-2200  •  Fax 220-1214

recommendations of medical personnel; putting the Victim-Plaintiff on unpaid, "AWOL" status; and further harassing her and instructing her to leave the premises when she attempted to return to work.

57.   Plaintiff Smith-Thompson's inability to work is a direct result of Defendant DOC's fostering a hostile work environment, refusal to discipline its employees and forcing Ms. Smith-Thompson to continue working within the same conditions from which she filed her complained in violation of the DC Human Rights Act §2-1401.01, *et. seq.*

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees and costs, and further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

## COUNT III
### (ASSAULT – DEFENDANT RODRIGUEZ)

58.   Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 through 57 as if fully set forth herein.

59.   As stated above, Defendant Rodriguez frequently spoke to Plaintiff Smith-Thompson in a lewd and sexually explicit manner, intentionally threatening offensive sexual touching.

60.   Plaintiff Smith-Thompson reasonably believed that these sexual advances would imminently result in a battery / offensive touching of her person and Defendant Rodriguez had the apparent ability to carry out these threats.

61.   Plaintiff Smith-Thompson reasonably believed that, because of Defendant Rodriguez' ability to carry out these threats, she was in imminent danger of offensive, sexual, bodily harm.

seph
**Greenwald
& Laake**

:ph, Greenwald & Laake, P.A.
)4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

I) 220-2200  •  Fax 220-1214

11

62.   Plaintiff Smith-Thompson feared working with Defendant Rodriguez because she feared that he would act on his threats.  These fears further developed into medical problem into chronic headaches, hypersomnia, Major Depressive Disorder and a stress related ulcer.

63.   Because of Defendant Rodriguez' conduct and actions, Plaintiff Charline Smith-Thompson has suffered and will continue to suffer severe mental anguish, medical and other related expenses, and loss of income.

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees and costs, and further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

## COUNT IV
### (BATTERY – DEFENDANT RODRIGUEZ)

64.   Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65.   As stated above, *inter alia*, Defendant Rodriguez intentionally grabbed Plaintiff Smith-Thompson's head and pulled it towards his crotch.

66.   Additionally, on a separate occasion, Defendant Rodriguez intentionally reached out and touched Plaintiff's breast.

67.   Each of these incidents was unpermitted, non-consensual and offensive to Plaintiff Smith-Thompson.

68.   Because of Defendant Rodriguez' intentional offensive touching, Plaintiff has suffered and will continue to suffer severe mental anguish, medical and other related expenses, and loss of income.

)seph
   Greenwald
      & Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane  •  Suite 400
:enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees and costs, and further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

## COUNT V
### (INENTIONAL INFLICTION OF EMOTIONAL DISTRESS – DEFENDANT RODRIGUEZ)

69.    Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 through 68 as if fully set forth herein.

70.    Defendant Rodriguez, over the course of approximately one and a half years, routinely intentionally harassed Plaintiff Charline Smith-Thompson through a pattern of unwelcome, sexual touching, verbal abuse and sexual advances.

71.    This pattern of harassment and verbal torment is extreme and outrageous in degree and morally repugnant in character.

72.    Plaintiff Smith-Thompson has suffered severe emotional distress causing Major Depressive Disorder manifested by a blunting affect, a depressed mood, anhedonia, hypersomnia, chronic headaches, anorexia, weight loss, hair loss and a stress-related ulcer.

73.    These symptoms developed over the period during which Plaintiff Smith-Thompson was subjected to Defendant Rodriguez' harassment.  Therefore, this severe emotional distress is a direct result of the extreme and outrageous conduct perpetrated on a consistent basis by Defendant Rodriguez over the course of a year and a half.

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees and costs, and further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

Joseph
    Greenwald
        & Laake

ph, Greenwald & Laake, P.A.
4 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

## COUNT VI
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS – DEFENDANT DISTRICT OF COLUMBIA)

74.    Plaintiff adopts and incorporates by reference the allegations contained in paragraphs 1 through 73 as if fully set forth herein.

75.    Defendant Rodriguez during his employment with the DC Department of Corrections, over the course of approximately one and a half years, routinely intentionally harassed Plaintiff Charline Smith-Thompson through a pattern of unwelcome, sexual touching, verbal abuse and sexual advances.

76.    This pattern of harassment and verbal torment is extreme and outrageous in degree and morally repugnant in character.

77.    Plaintiff Smith-Thompson has suffered severe emotional distress causing Major Depressive Disorder manifested by a blunting affect, a depressed mood, anhedonia, hypersomnia, chronic headaches, anorexia, weight loss, hair loss and a stress-related ulcer.

78.    These symptoms developed over the period during which Plaintiff Smith-Thompson was forced by the DC Department of Corrections to continue working closely with Defendant Rodriguez'. Therefore, this severe emotional distress is a direct result of the extreme and outrageous conduct over the course of a year and a half where the Defendant District of Columbia refused to separate the Plaintiff from her harasser.

79.    Defendant District of Columbia refused and continues to refuse to separate Plaintiff Charline Smith-Thompson from her harasser with full knowledge of Plaintiff's abusive, hostile work environment and mental anguish manifested in symptoms diagnosed from its own Independent Medical Examination.

WHEREFORE, the Plaintiff, Charline Smith-Thompson, demands judgment against Defendants, for Three Million Dollars ($3,000,000.00) in damages, as well as attorneys' fees

)seph
Greenwald
& Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane • Suite 400
:enbelt, Maryland 20770

l) 220-2200 • Fax 220-1214

and costs, and further and additional relief as the nature of the case may require and which this Honorable Court shall deem just and proper.

Respectfully submitted,

JOSEPH, GREENWALD & LAAKE, P.A.

By: _____
Jay P. Holland Bar #422258
Brian J. Markovitz Bar # 481517
6404 Ivy Lane, Suite 400
Greenbelt, MD  20770
301/220-2200
*Counsel for Plaintiff*

Joseph
Greenwald
& Laake

eph, Greenwald & Laake, P.A.
04 Ivy Lane  •  Suite 400
enbelt, Maryland 20770

1) 220-2200 • Fax 220-1214

15